IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


THOMAS CARROLL, et al.        :      CIVIL ACTION
                              :
         v.                   :
                              :
                              :
WILLIAM STETTLER, III et al.  :      NO. 10-2262


MEMORANDUM

McLaughlin, J.                          April 18, 2013

        This lawsuit concerns monies that were transferred to

defendants as part of a Ponzi scheme operated by a third party,

Lizette Morice.  The plaintiffs, who lost their investments in

the fraudulent scheme, seek the voidance of these transfers

under the Pennsylvania Uniform Fraudulent Transfer Act and the

equitable doctrine of unjust enrichment.  In the instant motion,

they move for summary judgment against twelve defendants and

their entities.  Against nine defendants, they seek the return

of investment profits which had been transferred during the

course of the fraud.  Against the remaining three defendants,

who the plaintiffs have deemed "insiders" of the scheme, they

seek the return of investment profits and principal, as well as

salaries and commissions.

        In this opinion, the Court addresses the motion as to

the "insider" defendants only.  For the reasons stated below,

the Court grants the motion in part and denies it in part.

I.    <u>Factual Summary</u>[1]

   A.    <u>Gaddel Enterprises and Lizette Morice</u>

        Lizette Morice was the founder and head of Gaddel

Enterprises, Inc., a purported real estate investment firm,

which operated from sometime in early 2006 until July 2007.

Morice represented to the plaintiffs that Gaddel was in the

business of buying tax foreclosed properties from the state and

reselling those properties to relocation firms at a substantial

profit.  Tr. Change of Plea Hearing, <u>U.S. v. Morice</u>, No. 08-cr-

132-1, at 13:10-14:14 (Pl. exh. D).

        Morice's business plan involved obtaining substantial

investments from mortgage brokers as well as individual

investors.  As part of the investment pitch, Gaddel falsely

represented that, due to state regulations, it could not be the

owner of record for more than a certain number of properties per

quarter.  By putting forth a contribution, Gaddel investors

could earn a share of its profits.  <u>Id.</u> at 13-14.

        Morice and her colleagues recruited investors at her

New Jersey home, in her Pennsylvania and New Jersey offices, and

_____

[1] The facts presented here are undisputed unless otherwise noted.
Disputed facts are read in the light most favorable to the
nonmoving party, the defendants.  <u>Sheridan v. NGK Metals Corp.</u>,
609 F.3d 239, 251 n.12 (3d Cir. 2010).

at elaborate black-tie affairs paid for by Gaddel.  Investors

generally contributed around the sum of $1,000, but some

contributed multiples of that amount.  Many of the investors had

personal relationships with Morice and/or her employees.  Id.;

Verification of Troy McClain ("McClain Verif.") ¶ 25-27 (Docket

No. 537-1).

In reality, Morice and Gaddel made no such real estate

transactions, and monies paid to earlier investors were actually

derived from later investors – a chain of events commonly

referred to as a Ponzi scheme.[2]  On July 23, 2008, Morice pled

guilty to seven counts of mail fraud for conducting a Ponzi

scheme worth over $7 million dollars.[3]  Id. at 14-16.  She was

_____

[2] "A [P]onzi scheme is a scheme whereby a corporation operates
and continues to operate at a loss.  The corporation gives the
appearance of being profitable by obtaining new investors and
using those investments to pay for the high premiums promised to
earlier investors.  The effect of such a scheme is to put the
corporation farther and farther into debt by incurring more and
more liability and to give the corporation the false appearance
of profitability in order to obtain new investors."  Hirsch v.
Arthur Andersen & Co., 72 F.3d 1085, 1088 n.3 (2d Cir. 1995)
(internal citations omitted).

[3] In connection with her guilty plea, Morice admitted to the
above-referenced facts.  Tr. Change of Plea Hearing, at 13:10-
16:11.  In addition, the Court has granted the plaintiffs'
motion for judicial notice of the existence of the Gaddel Ponzi
scheme.  Order, 7/8/11 (ECF No. 356).

sentenced to ten years in prison in connection with these charges. Judgment, U.S. v. Morice, at 2 (Pl. exh. E).

The plaintiffs in the instant case consist of a class of persons or entities who had previously invested in Gaddel and had incurred a net loss in a defined time period and who were not paid salaries by Gaddel. Order, 10/19/11, at 2 (Docket No. 417). The plaintiffs' investments were represented to be "100% fully refundable throughout the entire process." Pl. Mot. exh. II (Docket No. 501-48).

The defendants all received financial transfers from Morice and Gaddel sometime between April 2006 and July 2007. In particular, defendants Albin E. Delgado, James Martin, and Troy McClain were salaried employees of Gaddel.[4] The remaining ten defendants are non-employee investors who are not the subjects of this opinion.

_____

[4] The Court has included certain statements made by the defendants in its factual recitation. James Martin submitted a letter, which the Court docketed onto the record and instructed parties that it would be considered an opposition. Docket No. 511. Martin also appeared at oral argument. Troy McClain submitted a brief in opposition and appeared at oral argument. Of the three defendants, only McClain is represented by an attorney. Albin Delgado failed to submit any opposition to the motion for summary judgment and did not appear at oral argument.

B.   <u>Albin E. Delgado</u>

Albin Delgado was a paid employee of Gaddel Enterprises.[5]  As of June 2006, early in the Ponzi scheme, he held a supervisory sales role at Gaddel.  Pl. Mot. exh. H-I.

At a June 7, 2006 team meeting, Delgado prepared a list of rules for a Gaddel sales meeting.  It included information regarding how to "become a salesperson," namely having a credit check and a urine sample.  In addition, it included substantive instructions as to how to pitch investments in properties.  For example, it stated that "[n]o photos of any kind are to be taken of the properties by potential buyers or salespeople (no exceptions)."  It also stated that "[u]nder no circumstance is a buyer or salesperson to be on the property or in the driveway;" instead, buyers were "only allowed to briefly park in front for a visual."  Failure to adhere to this rule would "result in termination."  The document was signed "Albie Delgado, District Manager."  Pl. Mot. exh. I.

---

[5] Albinator Enterprises, Inc. is an entity owned by Delgado.  Am. Compl. at ¶ 19 (Docket No. 427); Pl. Mot. exh. H at 1.

C.  <u>James Martin</u>

James Martin was also a paid employee of Gaddel

Enterprises.[6]  He worked at Gaddel from November 2006 through

July 2007.  He was primarily recruited and trained by Troy

McClain, who he understood to have previous experience in the

mortgage industry.  James Martin Dep. 144:3-13; 246:4-249:13;

283:17-24 (Pl. exh. G).

Unlike McClain and Delgado, Martin was not the head of

any sales team.  In his capacity as a sales consultant, he

visited potential investors and discussed the program's

opportunities with them.  Once a week, he attended a sales

meeting in the Gaddel office.[7]  Martin communicated with McClain,

and to a more limited extent with Morice, regarding sales

pitches and promotion proposals.  His commission was one-and-a-

─────────────────

[6] Martin Marketing is an entity owned by Martin.  Am. Compl. ¶
16.  Chantel Martin is the wife of James Martin.  She was not
employed by Gaddel or Morice in any capacity.  Tr. Hr'g 3/13/13
at 52:20-53:6.

[7] In the excerpted portion of Martin's deposition accompanying
the plaintiffs' motion for summary judgment, the Court did not
see testimony from Martin regarding the frequency of his
presence in Gaddel offices.  During oral argument, Martin
represented that he only went to the office for Monday sales
meetings.  Tr. Hr'g 3/13/13 53:19-24.  The plaintiffs did not
contest Martin's statement.

half percent for each property closing.  Id. 166:12-167:3;
246:21-247:6; 554:6-556:5.

Martin was responsible for selling investments to
named plaintiffs Thomas Carroll and Kimberly Baker.  As part of
his sales pitch, he gave plaintiffs a "Frequently Asked
Questions" document, which included references to the fact that
the investment entailed no risk and was not a pyramid scheme.
At deposition, Martin testified that he knew of no other
opportunities that would produce such results.  He also
testified that at the time, he believed that Gaddel could turn a
$1,000 investment into $1 million dollars in two years.  Id.
347:20-34; 533:11-19; 534:3-12; see also Pl. Mot. exh. J.

It is uncontested that Martin invested at least
several thousand dollars of his own money in Gaddel.[8]  It is also
uncontested that Martin invested on behalf of his wife, and that
Martin recruited his mother and sister-in-law to invest, as

_____

[8] Specifically, the plaintiffs contend that Martin invested
$8,000.  Pl. Mot. at 26.  Martin stated during deposition that
he invested around $80,000.  Martin Dep. 454:6-9; see also Tr.
Hr'g 3/13/13 51:14-17.  This discrepancy reflects an issue
regarding amounts purportedly invested in Gaddel commercial
properties, which was a disputed subject among a number of
defendants.

well.  Id. 459:23-464:11; 454:6-9; see also Pl. Am. Compl. ¶ 16;
Pl. Mot. exh. QQ.


     D.   Troy McClain

    Troy McClain was also a paid employee of Gaddel.[9]  He
began working at Gaddel around January 2006 as a salesperson.
On or around July 2006, he was promoted to become the head of
Dream Team, one of six sales teams.  He worked out of the Gaddel
office in Morrisville, Pennsylvania.  As head of the Dream Team,
he managed 6 to 8 other salespeople.  He did not receive any
additional compensation after this promotion.  Def. McClain Opp.
exh. 1 ("McClain Verif.") ¶ 12, 15-16, 26-27.

    At the direction of Morice, McClain recruited Martin
to join Gaddel.  He also trained Martin and was the point person
when Martin delivered investment money to the main office.
Martin Dep. 143:7-144:17.

    Morice provided McClain with information related to
the property sales, including how the program worked and which
properties were purchased and sold as part of the foreclosure
program.  McClain then relayed this information through his

---

[9] McClain also owns and operates the entity Troy McClain Rental
Enterprises, Inc.  Am. Compl. ¶ 21.

sales presentations to potential investors.  McClain Verif. ¶ 24-25.

McClain was an authorized signatory for the Dream Team's corporate bank account.  However, McClain has stated that he did not have access to these bank accounts, and that his signatures were forged on other corporate documents.  McClain had no knowledge about the network of mortgage brokers or Morice's corporate contacts.  Id. ¶ 16-17, 25, 30; see also Tr. Hr'g 3/13/13 34:9-35:13.

In addition to being a salesperson, McClain also took on service roles for Morice.  For example, he cleaned the office every six weeks.  He also provided chauffeur services for guests of Morice at meetings and for social events.  Id. ¶ 27.

It is uncontested that McClain invested at least seven thousand dollars in Gaddel.[10]  It is also uncontested that McClain spent some of his own money hiring a secretary and organizing sales meetings.  Id.

_____

[10] Plaintiffs contend that McClain only invested $7,000 in Gaddel.  Pl. Mot. at 26.  McClain stated that he invested $20,000 -- $9,000 in the residential property program and $11,000 in the commercial property program.  McClain verif. ¶ 36.

II.  <u>Analysis</u>

The plaintiffs commenced this action to void transfers related to investment profits, principal, salaries, and commissions, which were paid to the defendants from Gaddel accounts.[11]  Claiming relief under the Pennsylvania Uniform Fraud Transfer Act as well as the equitable doctrine of unjust enrichment, the plaintiffs now move for summary judgment under Fed. R. Civ. P. 56(a) on both counts.[12]

A.  <u>Pennsylvania Uniform Fraudulent Transfer Act</u>

The plaintiffs' first claim derives from Pennsylvania's version of the Uniform Fraud Transfer Act.  12 Pa. Con. Stat. § 5101, et seq.  Under PUFTA, creditors may obtain voidance of a transfer or obligation made to another party under three conditions: 1) the plaintiffs are "creditors"

---

[11] These monies would subsequently be distributed <u>pro rata</u> among the plaintiffs and class members.

[12] The defendant is entitled to summary judgment if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  An issue is genuine if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party; it is material if it may affect the outcome of the suit under governing law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

as defined by the statute; 2) the transfers were made with actual fraudulent intent; and 3) there are no viable defenses. Id. § 5104(a)(1); 5107(a)(1); 5108(d). Courts in this district have routinely accepted the application of PUFTA in Ponzi scheme situations, so long as all three criteria are met. E.g., Hecht v. Malvern Preparatory Sch., 716 F. Supp. 2d 395, 397-98 (E.D. Pa 2010); Schwartzman v. Sierra Capital Res., LLC, No. 11-7395, 2012 WL 5354595, at *3 (E.D. Pa. Oct. 31, 2012); Schwartzman v. Hutchison, No. 11-1349, 2011 WL 4471059, at *3 (E.D. Pa. Sept. 27, 2011).

### 1. "Creditor"

The plaintiffs must first establish that they are creditors of Gaddel. As defined by the statute, a person is a creditor if he "has a right to payment." 12 Pa. Con. Stat. § 5101(b). Here, the plaintiffs have presented undisputed evidence that Gaddel investments were "100% fully refundable through the entire process." This was made clear in sales presentations as well as on receipts. Pl. Mot. exh. II. Thus, even though the right has not been reduced to judgment, the plaintiffs qualify as creditors under PUFTA. E.g., In re Arbogast, 466 B.R. 287, 321 (Bankr. W.D. Pa. 2012).

2.  "Actual Fraudulent Intent"

Second, the plaintiffs must demonstrate that Gaddel transferred money to the defendants with the actual intent to defraud.  The mere existence of a Ponzi scheme is sufficient to establish an actual fraudulent intent.  See Hecht, 716 F. Supp. 2d at 395; Schwartzman, 2011 WL 4471059 at *3; see also In re Slatkin, 525 F.3d 805, 814 (9th Cir. 2008); S.E.C v. Res. Dev. Int'l, LLC, 487 F.3d 295, 301 (5th Cir. 2007).

In the instant case, Morice has admitted that she operated a Ponzi scheme.  Change of Plea Hearing, 13:10-16:11. The Court has previously granted the plaintiffs' motion for judicial notice of the existence of the Gaddel Ponzi scheme. Order, 7/8/11 (ECF No. 356).  This undisputed evidence is sufficient to establish PUFTA's second requirement.

3.  "Good Faith" Affirmative Defense

Finally, PUFTA allows for an affirmative defense commonly referred to as the "good faith" affirmative defense.  A transaction is not voidable under PUFTA if a transferee demonstrates that 1) he took in good faith and 2) for a "reasonably equivalent" value.  12 Pa. Con. Stat. § 5108.

As a preliminary matter, the Court holds that the
submissions by defendants McClain and Martin are sufficient to
invoke the affirmative defense, even if their answers do not
mention the defense by name.  See generally Fed. R. Civ. P.
8(c).  Defendant McClain's answer asserted "all defenses and
protections available under 12 Pa. Con. Stat. § 5108."  McClain
Answer (Docket No. 434).  Defendant Martin's answer asserted
that he had no inside information and that he was not a Gaddel
insider.  Martin Answer (Docket No. 9).  In light of defendant
Martin's pro se status, the Court will "apply the applicable
law, irrespective of whether the pro se litigant has mentioned
it by name."  Dluhos v. Strasberg, 321 F.3d 365, 369 (3d Cir.
2003).

In contrast, after answering the complaint, which also
did not mention the good faith defense by name, defendant
Delgado has not submitted anything else to the Court.  He failed
to submit any opposition to the plaintiffs' motion for summary
judgment, and he did not appear at oral argument.  The
evidentiary record in front of this Court does not contain
sufficient facts on which to support a defense of good faith on
behalf of Delgado.  Thus, the Court will grant the plaintiffs'
motion against Delgado and his entities as to the PUFTA claim,

and it will analyze the good faith defense as to defendants
Martin and McClain only.

### i. "Good Faith" under PUFTA

The first prong of the good faith defense is a showing
that the transferee took in good faith.  To assess good faith,
courts analyze "whether the investor has sufficient knowledge to
place him on inquiry notice of the voidability of the transfer."
Hecht, 716 F. Supp. 2d at 401. (internal citations omitted).

If the defendant ignored red flags which revealed the
true nature of the scheme, or there is other evidence that the
investment was too good to be true, then a court may find that
the defendant has not met his burden of proving good faith.
E.g., id.; In re Burry, 309 B.R. 130, 136 (Bankr. E.D. Pa.
2004).  Relevant factors include the investor's financial
sophistication, the number and nature of red flags, and whether
the monies the investor obtained likely deterred him from
investigating or taking other appropriate action.  S.E.C. v.
Forte, No. 09-63, 2012 WL 1719145, at *6 (E.D. Pa. May 16,
2012).  This inquiry is subjective:  a transferee must
demonstrate that he acted without "actual fraudulent intent."
Id., at *5.

After examining the evidence on the record in its entirety, the Court finds that there is a genuine dispute as to whether defendants Martin and McClain were on inquiry notice of the Gaddel Ponzi scheme. It holds that the plaintiffs are not entitled to judgment as a matter of law.

First, with regard to defendant Martin,[13] his exposure to the inner-workings of Gaddel was limited. Martin was several rungs removed from Morice on the Gaddel hierarchy. His employment at Gaddel began months after the Ponzi scheme began, and he only worked there for about seven months. He did not hold a leadership role in the company. Moreover, Martin understood that some of his supervisors had previous experience in the mortgage industry, and he has testified that at the time, he relied on these representations that an investor could exponentially multiply his original investments.

---

[13] The Court pauses to address a concern that Martin raised in his letters and during oral argument regarding his wife, Chantel Martin. It is undisputed that Chantel Martin was not employed by Gaddel and did not have access to any insider information. Tr. Hr'g 3/13/13 at 52:20-53:6. The plaintiffs have not made any request to hold her liable for investment principal as an insider, but rather for the investment profits only. The analysis for the Martins' liability regarding investment profits is discussed in footnote 14 of this opinion.

The plaintiffs rely primarily on the fact that Martin crafted certain emails that were sent to Gaddel colleagues, including Morice. Pl. Mot. at 24. One email described how an $1,000 investment could become $1 million dollars in two years. The other proposed a contest for sales representatives to incentivize clearing property inventory at the end of the year. Pl. Mot. exh. L-M. They also point to the fact that he stated at a deposition that he knew of no other opportunity which would offer such returns. Pl. Mot. at 24.

However, Martin's sales pitches and correspondences with Morice aligned with Gaddel's representations in general – that investing small amounts of monies in foreclosed properties can lead to huge returns – and offered no proof that he was privy to any unique knowledge regarding the scheme. His understanding that no other investment offered comparable returns is by itself insufficient for the Court to presume inquiry notice. A reasonable jury could find that Martin's belief in his employer, however uninformed, was not so unfounded that he should have known it was too good to be true.

As to defendant McClain, the Court also finds that there remain genuine issues of material fact regarding his level of special access. On one hand, McClain's relationship with

Gaddel began at an earlier stage and he stayed throughout the whole Ponzi scheme period, taking some leadership role. However, from the evidence on the record, the information conveyed by McClain was not unique in comparison to the information conveyed by others. It is unclear whether McClain accessed the Dream Team bank accounts, and even if he did, there are other reasons to explain why that particular account did not reflect real estate transactions.

McClain was never deposed by the plaintiffs, but in an unsworn verification he submitted to the Court, he stated that he had no knowledge of Morice's network of mortgage brokers or corporate contacts. He has also recounted in great detail the elaborate galas thrown by Morice and the distinguished guests who attended. He emphasized that many of Gaddel's investors were well-respected in the mortgage industry. McClain Verif. ¶ 27-29. It would not be unreasonable for a factfinder to believe McClain's version and to find that he was not on inquiry notice of the scheme.

Thus, the Court holds that there remain genuine issues as to whether defendants Martin and McClain were on inquiry

notice of the Gaddel Ponzi scheme.[14]  It now turns to the second

prong of the good faith affirmative defense:  an exchange of

"reasonably equivalent value."


ii.  Exchange for Reasonably Equivalent Value

Second, a defendant seeking to invoke the good faith

affirmative defense must also demonstrate that the monies he

received were exchanged for a reasonably equivalent value.  12

Pa. Con. Stat. § 5108.

This prong of the good faith affirmative defense

distinguishes between the types of monies that can be avoided

under PUFTA.  There are three categories of monies at stake:

investment principal, investment profit, and salary/commissions.

A return of the principal of an investment will always be a

"reasonably equivalent value" exchange, because by definition,

the transferor is returning exactly the amount that was

originally invested.  Hecht, 716 F. Supp. 2d at 401.  However,

the investment profits derived from a Ponzi scheme cannot, as a

--------------------------------

[14] To the extent that the Court denies the motion for summary
judgment as to Martin and McClain, it denies it as to the
entities Martin Marketing and Troy McClain Rental Enterprises,
Inc., as well.  The plaintiffs have not pointed to any facts
that would lead the Court to conclude that the entities ought to
be held liable for actions beyond those of the named defendants.

matter of law, have been "exchanged" for anything of reasonably equivalent value; they are by definition over and above the investment itself.[15] As the Ninth Circuit reasoned, "Amounts above [the initial investment] are merely used to keep the fraud going by giving the false impression that the scheme is a profitable, legitimate business. These amounts are not a 'reasonably equivalent' exchange for the defrauded investor's initial outlay." Donnell v. Kowell, 533 F.3d 762, 777-778 (9th Cir. 2008).

Finally, there is the issue of sales/commissions that were paid to an employee on behalf of their sales and brokerage services. Courts have been divided as to whether a transfer to

---

[15] In the instant case, the plaintiffs have conceded that McClain did not receive any investment profits from Gaddel. Pl. Supp. Memo. at 2 (Docket No. 570). There remain genuine issues as to the amount invested by Martin, which subsequently affects how much of the monies transferred were a return on principal and how much was pure profit. Martin has consistently maintained that he invested $80,000, making him a net loser in terms of investment even when taking his salary into account. See, e.g., Martin Dep. 454:6-9; Tr. Hr'g 3/13/13 51:14-17. The plaintiffs have stated that only $8,000 of these transactions is reflected in Gaddel and Martin bank accounts. Due to these issues of material fact, the Court denies the plaintiffs' motion with respect to Martin's investment profits. Furthermore, because Chantel Martin's liability is tied to James Martin's liability, the Court denies the plaintiffs' motion with respect to Chantel Martin, as well.

a salesperson or broker in the Ponzi scheme context can ever be an exchange for reasonably equivalent value.

Some courts, including the Fifth Circuit, have been reluctant to find that the recruitment of new investors for a Ponzi scheme can ever constitute value added to the company. These courts' inquiries take into account the nature of the Ponzi scheme and the defendant's role within that Ponzi scheme. See, e.g., Warfield v. Byron, 436 F.3d 551, 560 (5th Cir. 2006) (taking the position that analysis of value should consider "the degree to which the transferor's net worth is preserved."). Because the selling of investments in furtherance of a Ponzi scheme serves only to perpetuate an illegal fraud, the value conferred by the salespeople is illegal in its nature. Thus, as the argument goes, no exchange of reasonably equivalent value could have taken place. See In re Randy, 189 B.R. 425, 438-39 (Bankr. N.D. Ill. 1995); see also Warfield, 436 F.3d at 560 (citing cases); see also id. ("It takes cheek to contend that in exchange for the payments he received . . . the Ponzi scheme benefited from his efforts to extend the fraud by securing new investments.").

Other courts have shied away from a per se rejection of the good faith affirmative defense and have determined that

the defense should be considered on a case-by-case basis. The
Eleventh Circuit, for example, has held that a daughter of the
Ponzi scheme propagator, who received as commission a percentage
of the total revenue, was entitled to present a good faith
affirmative defense.[16]  In re Fin. Federated Title & Trust, Inc.,
309 F.3d 1325, 1332 (11th Cir. 2002) (citing cases).  It
concluded that a determination of value given "should focus on
the value of the goods and services provided rather than on the
impact that the goods and services had on the bankrupt
enterprise."  Id.; see also In re Churchill Mortg. Inv. Corp.,
256 B.R. 664, 678 (Bankr. S.D.N.Y. 2000), aff'd, Balaber-Strauss
v. Lawrence, 264 B.R. 303, 308 (S.D.N.Y. 2001); In re
Carrozzella & Richardson, 286 B.R. 480, 487 (D. Conn. 2002).
The Third Circuit has not weighed in on this circuit split.

        This Court is inclined to agree with the Eleventh
Circuit.  The statute's iteration of the affirmative defense, as

---

[16] The Court notes that In re Financial Federated, as well as the
Balaber-Strauss case discussed below, interpret "reasonably
equivalent value" in the context of Section 548 of the
Bankruptcy Code, not of a Uniform Fraudulent Transfer Act.
However, the constructive fraud provisions of PUFTA and the
Bankruptcy Code should be construed uniformly.  E.g., Fidelity
Bond & Mortg. Co. v. Brand, 371 B.R. 708, 719-20 (Bankr. E.D.
Pa. 2007); cf. In re Hemstreet, 258 B.R. 134, 137 (Bankr. W.D.
Pa. 2001).

well as its definition of a "reasonably equivalent value," makes no mention of a scheme-based analysis of the transaction; rather, in stating that a transfer is not fraudulent "against a person who took in good faith and for a reasonably equivalent value," the focus is placed on the specific transferee and the specific transfer.  12 Pa. Cons. Stat. § 5108(a); see also 12 Pa. Con. Stat. § 5103(b).  Moreover, the statute's Commentary discussing what is reasonably equivalent value also speaks in specific terms and states that such analyses of value should be "purely objective."  12 Pa. Con. Stat. § 5103, cmt. 1, 3.  To find that sales commissions in the Ponzi scheme context are by definition not reasonably equivalent would call for a broad-based analysis of the scheme at large.  Yet "the statutes and case law do not call for the court to assess the impact of an alleged fraudulent transfer in a debtor's overall business."  In re Churchill, 256 B.R. at 680.

In Balaber-Strauss, the Southern District of New York held that brokers, who had originated bogus mortgage investments and solicited investors, were entitled to an analysis of whether their services were worth an equivalent value to the company as their payout.  264 B.R. at 308.  Disagreeing with Randy, the court held that the brokers' actions as it related to the

overall Ponzi Scheme "is of no relevance" to the inquiry; rather, "[v]alue is present if the debtor receives a fair equivalent in exchange for its property or obligation."  Id. Thus, "for value" should analyze the specific transaction, and whether the defendant actually performed the services for which they were paid and whether the commissions were proportionate to those paid in the industry.  Cf. In re Churchill, 256 B.R. at 678.

        In the instant case, reasonable minds could disagree about whether defendants Martin and McClain provided services that were reasonably equivalent to the value of the monies paid out to them.  There is no evidence that either defendant failed in the scope of their sales employment; quite the contrary, the evidence presented shows that both were diligent in effecting sales, reaching out to their contacts on a regular basis.  There is also evidence that at least McClain had responsibilities within Gaddel that were not related to sales.  For example, in his verification, he states that he performed custodial and chauffeur duties.  Finally, McClain has also contended that his compensation was consistent with his prior employment.  McClain Verif. at ¶ 27.

The Court denies the plaintiffs' motion as to the PUFTA claims against defendants Martin and McClain. Even though the plaintiffs have established that they are creditors under PUFTA and that the Gaddel transfers were made with actual fraudulent intent, there remain genuine issues of material fact as to whether the transfers qualify for the affirmative defense.

B.    Unjust Enrichment

The plaintiffs have also put forth a parallel state law unjust enrichment claim.[17]  Under Pennsylvania law, a plaintiff can recover in equity under an unjust enrichment claim if he demonstrates: (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment or value. AmeriPro Search, Inc. v. Fleming Steel Co., 787 A.2d 988, 991 (Pa. Super. Ct. 2001).

---

[17] To a large extent, the plaintiffs' unjust enrichment arguments mirror their PUFTA arguments.  Cf. Pl. Mot. at 26 ("For similar reasons as set forth above, Plaintiffs are also entitled to prevail on their unjust enrichment claim.").  It does not appear that the plaintiffs seek any additional remedies in equity above that which is required under PUFTA.

The most significant element of the doctrine is whether the enrichment of the defendant is unjust.  Id.; see also Hecht, 716 F. Supp. 2d at 402 (denying a defendant's motion to dismiss an unfair enrichment claim under Ponzi facts).  The Court holds that the plaintiffs have not met their burden on this factor as to defendants Martin and McClain.[18]  As previously discussed, these defendants have sufficiently demonstrated that they may be entitled to an affirmative defense under PUFTA, because there remain genuine issues as to whether the transactions were accepted by Martin and McClain in good faith.  The plaintiffs have not cited to any case law for the premise that a transfer can fail under PUFTA but still be deemed inequitable as a matter of law.  They also have not pointed to any facts on the record that would lead to the conclusion in this case.

In conclusion, the Court denies the plaintiffs' motion for summary judgment as to defendants James and Chantel Martin, Troy McClain, and their respective entities.  There remain

---

[18] Because defendant Delgado did not submit a brief in opposition or appear at oral argument, the Court does not have any evidence on the record that would support his position in equity, either.  Thus, the Court grants the plaintiffs' motion as to their unjust enrichment claim against Delgado.

genuine issues of material fact regarding whether the Gaddel transactions fall under the good faith affirmative defense and whether the plaintiffs are entitled to remedies in equity. However, the Court grants the plaintiffs' motion as to defendant Delgado and Albinator Enterprises, Inc.  Without any argument from Delgado, either in the form of a brief in opposition or during oral argument, the Court does not have any facts with which to rebut the plaintiffs' contentions against him.

An appropriate order shall issue separately.